UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


TERRY HOTCHKISS and
MARY HOTCHKISS as
co-guardians of J.T., a minor,

                            Plaintiffs,

v.                                                          Case Number 11-CV-12582
                                                            Honorable Thomas L. Ludington
CHRISTINE GARNO, individually and
in her official capacity, and
MERRILL COMMUNITY SCHOOL DISTRICT

                            Defendants.
_____/


**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART PLAINTIFFS' MOTION TO AMEND AND GRANTING IN PART
AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


The principal purpose of trial is to determine the truth from conflicting factual narratives.

*See generally Estes v. Texas*, 381 U.S. 532, 540 (1965) (observing trials "are held for the solemn

purpose of endeavoring to ascertain the truth"); John Langbein et al., *History of the Common

Law* chs. 1, 4, 8 (Aspen 2009) (discussing historical development of civil trial in Anglo-

American tradition).  When the material facts are not disputed, a court can decide the case as a

matter of law, rendering trial unnecessary.  But when the facts are disputed, a trial is required to

decide who is being truthful.

This civil rights action — literally, a case of he-said-she-said — is of the latter type.  It

arises out of allegations made by J.T., the only African-American student at the middle school

operated by Defendant Merrill Community Schools.  J.T. alleges that that the middle school

principal, Defendant Christine Garno, strip-searched J.T. when he was in sixth grade, and again when he was in seventh grade.  Ms. Garno alleges that she did no such thing.

J.T.'s guardians, Plaintiffs Terry and Mary Hotchkiss, bring suit against Ms. Garno and Merrill Schools seeking redress for J.T. for the alleged searches.  Presently before the Court are Plaintiffs' motion for leave to amend the complaint (ECF No. 14) and Defendants' motion for summary judgment (ECF No. 35).  Plaintiffs seek leave to assert claims pursuant to 42 U.S.C. § 1983 and Title VI.  Defendants seek summary judgment on these claims.

For the reasons detailed below, each motion will be granted in part and denied in part.  Briefly, because Plaintiffs have raised a genuine issue of material fact regarding whether the alleged strip-searches occurred, Ms. Garno is not entitled to summary judgment on the § 1983 claim.  Because Plaintiffs have not demonstrated that Merrill Schools had a policy authorizing such a search, however, Merrill Schools is entitled to summary judgment on the § 1983 claim.  And because Plaintiffs have not demonstrated that J.T. was discriminated against because of his race, both Defendants are entitled to summary judgment on the Title VI claim.

**I**

This case, as noted, arises out of two alleged strip-searches of J.T. by Ms. Garno while J.T. was a middle school student.

Merrill Schools has a published policy prohibiting strip-searches.   "Under no circumstances," the policy provides, "will school staff conduct or be party to a strip-search." Merrill Area Public School District Search Procedures ¶ (A)(1)(a), *attached as* Pls.' Opp'n to Defs.' Mot. Summ. J. Ex. 8.  It elaborates:

1)  Who May Conduct a Search

    a) A school official or his/her designee and one additional person may conduct a search. Under no circumstances will school staff conduct or be party to a strip-search.

        1) A school official is defined as a Board Member, a superintendent, an assistant superintendent, a principal, an assistant principal, or lead teacher.

        2) A designee is defined as any District employee designated by a school official for the purpose of conducting a search. If there is a certified school employee present, that individual shall be the designee.

        3) On a field trip, during an extra-curricular activity, or on a school bus, any school official or his/her designee, male or female, may conduct a search without the guidelines of the procedures covered under this policy. . . .

3) Search of Students

. . . No school official may conduct a search unless he/she suspects, from reliable information of personal observation, that a student is in violation of school rules, local ordinance or state law.

In such cases, the following procedure will be used:

    a) The student will be informed of the reason for conducting the search.

    b) Permission of the student to conduct the search will be requested.

        1) Conducting the search with the student's consent.

        The school official or his/her designee who is conducting this search has the right to request a student to empty pockets, purses, backpacks, or other articles used to carry personal effects; to remove hats, shoes, and/or to roll socks down. The school official can also request a student remove outer garments, such as sweatshirts, sweaters, jackets or vests if worn over blouses, shirts or t-shirts. No school official or school employee has the right to request the removal of any other clothing or to conduct a strip search.

*Id*. ¶ (A)(1), (3). The policy goes on to establish a number of procedures if the student refuses to consent to the search. These procedures depend on the age of the student and whether the school official has reasonable suspicion that the student poses a danger to others.

**A**

The first alleged search occurred on January 26, 2010, when J.T. was in sixth grade.  J.T. Dep. 88:1–5, Oct. 18, 2011, *attached as* Pls.' Opp'n to Defs.' Mot. Summ. J. Ex. 1.  That day, J.T. was watching a basketball game at school.  Although he knew that school rules prohibited laser pointers in school, J.T. had one.  *See* J.T. Dep. 88:1–25.  Shaped like a small gun, it emitted beam that projected a small dot of light.  J.T. Dep. 88:17–18.

After Ms. Garno learned that J.T. had a laser pointer, he recalls, "she came next to me when I was sitting down at the basketball game, she grabbed me.  She didn't actually grab me, and she told me to come here and she brought me in this one office next to the gym."  J.T. Dep. 90:18–21.

Once in the office, J.T. alleges, Ms. Garno asked whether J.T. had a laser pointer.  J.T. Dep. 90:21–23.  He denied having one.  *Id.*  Inquiring into what transpired next, counsel for Defendants asked J.T. in his deposition:

> Q:  You said no?
> A:  Yes.
> Q:  All right.  Then what happened?
> A:  Then she was like [J.T], don't lie to me.  I'm like I do. . . .  I got it.  And she's — I gave it to her and she's like do you have anything else and I was like no and that's all.
> Q:  That's all.
> A:  Yes.
> Q:  So you didn't take your clothes off?
> A:  Yeah, I did.
> Q:  You did take your clothes off?
> A:  Yes.
> Q:  All your clothes?
> A:  Yes.
> Q:  Why?
> A:  Not all of them, just my pants.  My shorts.
> Q:  Your what?
> A:  My shorts.
> Q:  Let me back up.
> A:  Because at first I didn't tell her that I didn't have them.

Q: Let me ask the questions, okay.   You're sitting at a basketball game, apparently somebody told her you had a laser gun she asked you to come with her.  Am I right so far?

A: Yes.

Q: All right. She takes you into an office that's by the gym where they're playing the basketball game, true?

A: Yes. . . .

Q: All right.  Now, who was in the office besides yourself and Ms. Garno?

A: Just me and her.

Q: All right.  And she asked you if you had a laser gun?

A: Yes.

Q: And you said no?

A: Yes.

Q: All right.  Did she say anything else after that?

A: No, she started searching my pockets.

Q: I see.  Did she say anything when she was searching your pockets?

A: No. she was just searching.

Q: All right.  And did you say anything?

A: No.

Q: Then what happened?

A: Then she was asking me — because I had a pair of inside shorts like you can flip them inside out, both ways and there's pockets, and she pulled them down to check the pockets in them on the other side.

Q: Did you have underwear on?

A: Yes.

Q: I see.  And then what happened?

A: Then I pulled them back up and then I left.

J.T. Dep. 90:24–92:6, 93:5–94:2.  Discussing the depth of the alleged search, J.T. was asked:

Q: Now, did you have underwear on underneath the shorts?

A: Yes.

Q: Did you have boxers or briefs?

A: Boxers.

Q: Okay, and tell me how — I think I understand but I want to make sure.  How did Mrs. Garno search your pockets?

A: Like I pull them down.

Q: Did she tell you to pull them down?

A: Yes.

Q: Did she pat you down before that?

A: Yes.

Q: So she patted you down and then told you to pull them down?

A: I told them about how my shorts are.

Q: Why don't you stand up for us, please, and tell us how low you took those?

A: I took them down about right here.

> Q: And you're pointing to about maybe six inches above your knee? Or give me
> an estimate. I have my finger on your kneecap here, show me where it was in
> relation to your kneecap.
> A: Right here.
> Q: So you brought your shorts down to your kneecap?
> A: Uh-huh.
> Q: Is that the top of the shorts, the bottom of the shorts or the whole?
> A: The top.

J.T. Dep. 109:16–110:19. Further inquiring into this incident, counsel for Defendants asked J.T.:

> Q: You say she searched your pockets. What happened is that she asked you to
> turn your pockets inside out, didn't she?
> A: Yes.
> Q: And you did it?
> A: Yes.
> Q: All right. And she asked you to turn out your backpack, didn't she?
> A: No.
> Q: No. She asked you to let her look in your backpack?
> A: No.
> Q: She just looked in your backpack?
> A: Yes.
> Q: I see. And that's where the laser gun was, wasn't it?
> A: Yes.
> Q: And she found it, didn't she?
> A: Yes.
> Q: And that was before you claim she took your pants down or had you take your
> pants down, true?
> A: It was like the same time, during the same time.
> Q: I see. So you were taking your pants down while she was getting the laser
> gun out of your backpack?
> A: Yes.
> Q: So she was looking in your backpack, right?
> A: Yes.
> Q: And found the laser gun?
> A: Uh-huh.
> Q: You gotta say yes or no.
> A: Yes.
> Q: And this was the end of it, wasn't it?
> A: Yes.

J.T. Dep. 94:23–96:2.

Ms. Garno, in turn, acknowledges that she confiscated the laser pointer from J.T., but recalls the remainder of the incident much differently.  Garno Dep. 36:1–15, Feb. 16, 2012, *attached as* Pls.' Opp'n Ex. 2.

The incident began, she recounts, after "a parent had come to me [and] reported that [J.T.] had been seen with . . . a laser.  So I saw him sitting in the bleachers [and] indicated for him to come down.  We went over to the, we went out into the lobby and I asked him about it.  And I don't recall I think he, he had it on him, I think it was in his bag."  Garno Dep. 36:1–8.  Counsel for Plaintiffs inquired, "Did he get searched in any fashion on that day?"  Garno Dep. 36:13.  Ms. Garno responded, "I don't recall that I searched him I think it was in his bag."  Garno Dep. 36:14.  Counsel for Plaintiffs further inquired, "Have you ever asked him to turn his pockets inside-out, so that you could see the contents of his pockets?"  Garno Dep. 27:17–18.  Ms. Garno responded, "No, I don't recall ever doing that." Garno Dep. 27:19.

**B**

The second incident occurred the following school year, when J.T. was in seventh grade.  J.T. Dep. 56:1–68:19.  On October 13, 2010, J.T. had football practice after school.  That afternoon, Merrill Schools was hosting a girls' volleyball game.  Compl. ¶ 11.  The visiting team used the girls' locker room; the home team used the boys' locker room.  *Id*. ¶ 12.  The football team changed in the boys' bathroom.

Before practice, J.T. recalls, he walked to the store with two friends, M.F. and N.R., to get something to drink.  J.T. Dep. 17:15–18:4.  When they got back to school, the young men saw that the locker rooms had been left unlocked.  J.T. Dep. 18:18.  They entered the visiting team's locker room, J.T. recalls, "and we were going through people's stuff and so I thought that

we should go, so we left.  And then my — I didn't have anything, then my friend, he had an MP3 player and I said can I have that and he said yes and I had that."  J.T. Dep. 18:20–24.

About this time, After leaving the locker room, J.T. changed for practice in the boys' bathroom.  J.T. Dep. 31:11–14.  Like his teammates, for football practice J.T. wore a white girdle beneath black practice pants.  Shebester Dep. 6:8–23, Mar. 1, 2012, *attached as* Pls.' Opp'n Ex 3.  He did not wear undergarments or an athletic supporter under his girdle.

About this time, Dawn Poscal, the administrative assistant to athletic director of Merrill Schools, alerted Ms. Garno to a problem.  Specifically, Ms. Poscal recalls, a coach from the visiting volleyball team "had said that they had things missing and some items broken in their locker room.  And that the locker room had been ransacked."  Garno Dep. 9:9–11.

Ms. Garno went to the locker room, where she met with the volleyball coaches and players.  She recalls "one of the girls reported that she had seen a middle school aged young boy in the locker room and she said he was a young black man.  And I also had a couple of our students report that they had seen several middle school students that were getting ready for their football practice in the hallway, in and about the hallway at that time."  Garno Dep. 10:8–14.  Counsel for Plaintiffs inquired in Ms. Garno's deposition:

> Q:  [W]hen they tell you that there was an African-American middle school aged student seen near or in the locker room do you create a mental impression of who it might be?
> A: Yes. . . .
> Q:  So when you hear there was an African-American student you immediately thought [J.T.]?
> A:  I thought of him.

Garno Dep. 10:21–25, 11:11–13.  (J.T., as noted, asserts that he is the only African-American student at the middle school.  *See, e.g.*, Pls.' Supp. Br. Mot. to Amend 3 ("J.T. is the only

African-American player on the team and the only African-American student in the middle school."), ECF No. 33.)

Merrill students also identified three other students seen around the locker room, with Ms. Garno recollecting "I don't recall the names specifically, I think one was M.F.  I remember there were three names, but I don't recall specifically who they were."  Garno Dep. 11:24–12:1. One of the visiting volleyball players also told Ms. Garno that a grey MP-3 player with a cracked screen and white earbuds was missing.  Garno Dep. 13:1–10.  A second girl told Ms. Garno that an iPod was also missing.  Garno Dep. 12:24–25:3.  But, Ms. Garno alleges, "the coach said to hold off. . . .  Because she said she wasn't really sure that that was really missing, but we did, the one girl was really specific about the MP-3 Player."  *Id.*

Going to the football field with Ms. Poscal, Ms. Garno alleges, she approached the football coach and asked to speak with J.T. and the other students identified by name.  *See* Garno Dep. 14:5–15:5.  The group then gathered at the edge of the field, Ms. Garno asserts, recalling in her deposition: "I don't think we got very far and Mrs. Poscal noticed something hanging from J.T.'s bag and she asked him what it was.  And when he pulled it out it was ear buds and then I looked in his bag and the MP-3 Player was in his bag and it was gray and it had a cracked screen."  Garno Dep. 15:18–23.  Counsel for Plaintiffs inquired of Ms. Garno:

> Q:  So you removed the MP-3 Player and ear buds from J.T.'s bag?
> A:  I believe I did, yes.
> Q:  Then what happened?
> A:   And then I told the other three boys that they could go back to the football practice.  And I told J.T. to follow me into the school, so he came in with Mrs. Poscal and I.
> Q:  Did you ask the other three boys if they had any items in their possession from the girl's locker room?
> A:  No, I don't believe I did.
> Q:  Did you presume they did not?
> A:  I don't know what I presumed at that time.  I just knew I had the MP-3 Player and that was the item we were looking for.

Garno Dep. 16:6–20.

J.T. recalls the encounter on the football field differently.  He alleges that Ms. Garno did not approach the coach, but rather came directly to J.T. and two other students.  J.T. Dep. 45:6–48:12.  "She pulled us aside and she said there's something that went wrong in the locker room.  Were you guys in the locker room?"  J.T. Dep. 46:19–21.  When the young men did not respond, "she said did you guys take anything and then she was done and I said yeah, I have an MP3 player but I didn't take it.  She's like okay, thank you.  Can I have it?  I gave it to her."  J.T. Dep. 47:6–9.

The parties agree that Ms. Garno ordered J.T. to follow her from the practice field to school.  Once there, Ms. Garno directed J.T. to the teacher's lounge while she spoke with the volleyball coach and players.  *See* J.T. Dep. 51:12–52:6.  Picking up the events at this point, Defendants' counsel inquired of J.T.:

> Q:  How long were you in the teacher's lounge by yourself?
> A:  Like four minutes.
> Q:  That's a pretty precise amount of time.  How do you know that?
> A:  I don't know.  Just a guess of it.
> Q:  All right.  Then what happened?
> A:  Then she came in there.
> Q:  Who is she?
> A:  Ms. Garno.
> Q:  Ms. Poscal was with her?
> A:  No. . . .
> Q:  Then what happened?
> A:  She told me that I could sit down. . . .  When I was sitting down I was moving my pads around and she asked me what you were doing that for, and she pointed, she said take those off and I stood up and I took them off.

J.T. Dep. 54:18–55:4, 55:20–21, 56:6–9.  Inquiring into the specifics of these allegations, Defendants' counsel asked J.T.:

> Q:  When you say moving pads around, are you talking about your shoulder pads or what pads?

A:  My thigh pads. . . .
Q:  When you say you were moving them around, your hands were where?
A:  On them.
Q:  Which means that they were on your thighs?
A:  Yes. . . .
Q:  All right.  And your testimony is that Ms. Garno asked what you were doing?
A:  Yes.
Q:  Were those her words?
A:  Yes.
Q:  And what was your response?
A:  I was like moving them around and she was like [—]
Q:  What did she say?
A:  She — she pointed at my legs and said take those off, and I took my pants off, and then she was sitting there writing everything down, and then she didn't say anything about my girdle so I started to pull that down but somebody walked in.

J.T. Dep. 56:10–12, 56:24–57:3, 58:4–16.  Probing further, counsel asked:

Q:  When you say that you took them off, what did you take off?
A:  My football pants.
Q:  All right.  And you still had your girdle on?
A:  Yes.
Q:  All right.  And your spikes?
A:  Yes.
Q:  How do you get your pants off over your spikes?
A:  They weren't all the way off, they were down to my ankles.
Q:  So you didn't take them off?
A:   Well I thought that if you are taking them off, they're down at your ankles, too.
Q:  So her words were take them off and you dropped your pants to your ankles, is that —
A:  Yes.
Q:  And where was Ms. Garno while you were doing that?
A:  Sitting in the chair next to me. . . .
Q:   All right.   And had you had any other conversation with her when that happened?
A:  No.  I just said why. . . .
Q:  All right.  So Ms. Garno said take them off?
A:  Yes.
Q:  You concluded that she meant your football pants?
A:  Yes.
Q:  You stood up and dropped your pants?
A:  Yes.
Q:  You didn't take them off?
A:  No.

> Q:  All right.  Did you say anything?
> A:  I said why do you want me to take these off?  She said just do it. . . .
> Q:  Did you say why before you dropped your pants or after?
> A:  When I was starting to drop them.
> Q:  And she said just do it?
> A:  Uh-huh.
> Q:  Was she looking at you?
> A:  Yes.
> Q:  Was she still sitting down?
> A:  Yes.
> Q:   And then she didn't say anything else but you started to take your girdle down, is that what you are telling us?
> A:  Yes.
> Q:  Why did you start to take your girdle down?
> A:  Because that's what I thought she meant at the time and she didn't tell me to stop doing it.
> Q:  All right.  So you started to take your girdle down.  How did you do that?
> A:  I started to push [it] down.
> Q:  Then what happened?
> A:  And then a girl walked in and I pulled everything back up.

J.T. Dep. 62:18–64:12, 65:10–66:4.  Following this interruption, J.T. recollects, Ms. Garno told

him "grab your stuff, we're going to the main office."  J.T. Dep. 66:19–20.

Ms. Garno, in turn, acknowledges that she brought J.T. to the teacher's lounge, but recalls

the remainder of the incident much differently.  For example, counsel for Plaintiffs inquired of

Ms. Garno in her deposition:

> Q:  [D]id you ever ask him to remove any articles of clothing?
> A:  No.
> Q:  Did he ever take any articles of clothing off in your presence?
> A:   He might have taken, I know his shoulder pads came off, he wasn't wearing his shoulder pads and I believe when he came off the field he might have had those on. . . .
> Q:  Did you ever ask him to remove pants or football pants?
> A:  No. . . .
> Q:  On October 13, 2010 was he ever required to expose himself in any fashion?
> A:  No.

Garno Dep. 26:13–20, 26:23–25, 27:23–25.

Additionally, Ms. Garno asserts that she was not alone with J.T. in the teacher's lounge. *See* Garno Dep. 29:19–23. Rather, Ms. Poscal was present. *Id.*

Ms. Poscal confirms that she was present in the teacher's lounge and corroborates Ms. Garno's assertion that she did not order J.T. to remove his pants. On the other hand, Ms. Poscal recalls observing J.T. in white pants, not black (as noted, the girdle was white, the pants, black). *See* Poscal Dep. 18:18–21:12, Mar. 1, 2012, *attached as* Pls.' Opp'n Ex. 7. Counsel for Plaintiffs inquired of Ms. Poscal:

> Q: What was [J.T.] wearing?
> A: He was wearing a white t-shirt and white pants.
> Q: Anything else? Football gear?
> A: No, no, he had — no. I do remember, but I don't remember at what point Mrs. Garno said to him why don't you take, take your football gear off because it will be more comfortable meaning the pads. He had his pads on, so she had him for, to be comfortable to take off his pads and helmet.
> Q: Did you see him remove his football gear?
> A: I don't remember.
> Q: What did he remove?
> A: He removed his pads. . . .
> Q: Shoulder pads?
> A: Yes.
> Q: Padded pants as well?
> A: What was the question?
> Q: Did he remove his padded pants?
> A: Didn't see that.

Poscal Dep. 18:18–19:5, 19:11–16. Inquiring further, Plaintiffs' counsel asked Ms. Poscal:

> Q: Describe the white pants you said he had on.
> A: They were a football practice pant.
> Q: Are those pants padded to your knowledge?
> A: Football practice pants are, yes.
> Q: And is there any padding worn underneath the white pants you are describing if you know?
> A: Being a part of the athletic department yes there is a white pair.
> Q: A white pair of?
> A: Shorts underneath, like support type shorts. . . .
> Q: Did you ever see him take the outer white pants off exposing the white shorts that you've described?
> A: No.

Poscal Dep. 20:17–21:1, 21:8–10.

Leaving the teacher's lounge, Ms. Garno directed J.T. to the main office.  There, he was questioned by a police officer.   J.T. Dep.81:1–82:23.   Later, criminal charges were brought against  J.T. for theft and property damage; he pled guilty. .  J.T. Dep. 79:20–80:9.  Charges were not brought against M.F. or N.R.  Garno Dep. 25:1–4.  The school did not discipline them.  *Id*.

### C

In June 2011, J.T.'s guardians, Terry and Mary Hotchkiss, brought a four-count complaint on his behalf against Merrill Schools and Garno based on the alleged strip-searches. ECF No. 1.  Counts one through three assert claims against Garno for violations of 42 U.S.C. § 1983, and 42 U.S.C. § 1981, and the Michigan constitution.  Count four asserts the same claims against Merrill Schools.  Defendants timely answered, denying that the searches occurred.

In December 2011, Plaintiffs moved to amend the complaint to three counts.  ECF No. 14.  The first proposed count asserts race discrimination in violation of Title VI.  The second asserts sex discrimination in violation Title IX.  (Plaintiffs have since withdrawn the request for leave to add a Title IX claim. See Pls.' Supp. Br. Mot. to Amend 2 n.1.)  The third count asserts unreasonable searches in violation of § 1983.  In the proposed amended complaint, Plaintiffs withdraw their claimed violations of § 1981 and the Michigan constitution.

Defendants opposed the motion, asserting the amendments were futile because they would not survive a motion for summary judgment.    ECF No. 17.   In support, Defendants attached excerpts of deposition transcripts and discovery responses.

The Court, noting that discovery had not yet closed, entered an order in January 2012 holding Plaintiffs' motion to amend in abeyance. ECF No. 24.  The Court further directed that

after discovery closed, the parties should provide supplemental briefing to address Defendants'
arguments regarding the futility of the proposed amendments.

In April 2012, Defendants moved for summary judgment.  ECF No. 35.  Also in April,
the parties provided supplemental briefing on Plaintiffs' motion to amend.  ECF Nos. 33, 36.

## II

Federal Rule of Civil Procedure 15(a) provides that after a responsive pleading has been
served "a party may amend its pleading only with the opposing party's written consent or the
court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P.
15(a).  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper
subject of relief," the Supreme Court instructs, "he ought to be afforded an opportunity to test his
claim on the merits."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  The corollary to this
instruction, however, is "that the district court may deny a motion to amend if the court
concludes that the pleading as amended could not withstand a motion to dismiss."  *Head v.
Jellico Housing Auth.*, 870 F.2d 1117, 1124 (6th Cir. 1989) (quoting *Martin v. Associated Truck
Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986)); *see Foman*, 371 U.S. at 182 ("In the absence of
any apparent or declared reason — such as . . . futility of amendment, etc. — the leave sought
should, as the rules require, be 'freely given.'").

"A court properly may deny a motion for leave to amend as futile when the proposed
amended complaint would be subject to dismissal for any reason, including that the amendment
would not survive a motion for summary judgment."  *Bauchman v. West High Sch.*, 132 F.3d
542, 561 (10th Cir. 1997), *quoted in* 35A C.J.S. *Federal Civil Procedure* § 412 (2011); *cf. AM
Int'l, Inc. v. Graphic Mgmt. Assoc., Inc.*, 44 F.3d 572, 578 (7th Cir. 1995) (Posner, J.) ("The

point can be put more strongly: a judge should not grant a motion to amend the complaint if the grant would merely set the stage for the dismissal of the amended complaint.").

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### III

Plaintiffs seek leave to amend their complaint to advance two claims: a § 1983 claim and a Title VI claim. Defendants, in turn, assert that they are entitled to summary judgment on the claims asserted by Plaintiffs. As the decision regarding whether to grant a plaintiff leave to amend is but another way of deciding whether to grant the defendant summary judgment, the two claims (rather than the two motions) are each addressed in turn.

### A

Section 1983 provides in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws, shall be liable to the party injured in an action at law."  42 U.S.C. § 1983.

In this case, Plaintiffs assert that Defendants deprived J.T. of his the Fourth Amendment right to be free from unreasonable searches.  Ms. Garno is liable, Plaintiffs assert, because she conducted the searches.  Merrill Schools is also liable, Plaintiffs assert, because it had a policy that permitted such searches.

Moving for summary judgment, Ms. Garno asserts that she is entitled to judgment because of qualified immunity.  Merrill Schools asserts that it entitled to judgment because Plaintiffs have not identified a policy authorizing unconstitutional searches.

## 1

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)).

When a defendant raises a qualified immunity defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to the defense.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  To carry this burden, a plaintiff must demonstrate that the defendant violated a clearly established constitutional right.  *Id*.

In evaluating whether the plaintiff has done so, the Sixth Circuit instructs, a court is to apply a three-step analysis.  *Beard v. Whitmore Lake Sch. Dist*., 402 F.3d 598, 603 (6th Cir. 2005) (quoting *Champion*, 380 F.3d at 901).  First, the court must determine whether "the facts alleged show the officer's conduct violated a constitutional right."  *Saucier*, 533 U.S. at 201.  If a

violation is established, the court must next determine "whether the right was clearly established." *Id.* To be so, "the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Id.* Finally, the court must "determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Beard*, 402 F.3d at 603 (quoting *Champion*, 380 F.3d at 901).[1] "If the answer to all three questions is yes, then qualified immunity is not proper." *Beard*, 402 F.3d at 603.

In this case, the answer to all three questions is yes. First, the facts alleged by J.T. constitute a violation of a constitutional right. (As noted, on a defendant's motion for summary judgment, a court must view the evidence in the light most favorable to the plaintiff.) Specifically, the facts alleged by J.T. constitute a violation of the Fourth Amendment, which prohibits "unreasonable searches." U.S. Const. amend. IV.

Whether a particular search is unreasonable, the Supreme Court explains, "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995) (quoting *Skinner v. Ry. Labor Exes. Ass'n*, 489 U.S. 602, 617 (1989)). Moreover, "The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.' " *Vernonia*, 515 U.S. at 654 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 338 (1985)).

In *T.L.O.*, the Supreme Court rejected the argument that students checked legitimate expectations of privacy at the school's front door. 469 U.S. at 338–39; *see also Vernonia*, 515 U.S. at 665–66 (noting that "children assuredly do not "shed their constitutional rights . . . at the

---

[1] Although the Sixth Circuit has not uniformly applied this third step, it has noted that this third inquiry may, in some cases, increase the clarity of the court's analysis. *Armstrong v. City of Melvindale*, 432 F.3d 695, 699 (6th Cir. 2006).

-18-

schoolhouse gate' ") (quoting *Tinker v. Des Moines Indep. Cmty. Sch.Dist.*, 393 U.S. 503, 506 (1969)).  Noting that "the need to maintain order in a prison is such that prisoners retain no legitimate expectations of privacy in their cells," the Court wrote: "We are not yet ready to hold that the schools and the prisons need be equated for purposes of the Fourth Amendment."  *Id*. The Court cautioned in *Vernonia*, however, that "Fourth Amendment rights, no less than First and Fourteenth Amendment rights, are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children."  515 U.S. at 666.  Accordingly, in a school search case, a court must weigh the "scope of the legitimate expectation of privacy at issue" against "the character of the intrusion that is complained of."  *Id*. at 658

A student's legitimate expectation of privacy in his unclothed body, the Sixth Circuit observes, is "great.  Students of course have a significant privacy interest in their unclothed bodies."  *Beard*, 402 F.3d at 604–05 (citing *T.L.O.*, 469 U.S. at 337–38); Scott A. Gartner, Note, *Strip Searches of Students: What Johnny Really Learned at School and How Local School Boards Can Help Solve the Problem*, 70 S. Cal. L. Rev. 921, 928–31, 941–43 (1997) (describing impact of strip searches on students).

In *Beard*, for example, after money was stolen, male teachers forced twenty male students to completely disrobe in a locker room.  *Id*. at 603.  Separately, female teachers forced five female students to strip to their underwear.  *Id*.  The students brought suit, claiming their constitutional rights had been violated.  The Sixth Circuit concluded that the students' rights had been violated, but that the school officials were entitled to qualified immunity because the searches did not violate clearly established rights.  Addressing the students' expectations of privacy, the Sixth Circuit noted "that public school locker rooms are not notable for the privacy

they afford.  The boys were thus not deprived of a privacy interest as much as if they had been searched, for instance, in an office."  *Id*. at 605 (internal citation and quotation marks omitted) (quoting *T.L.O*., 515 U.S. at 657).  The court further noted that strip-searches are not merely intrusive, but "highly intrusive."  *Beard*, 402 F.3d at 605.  Unlike more focused searches (such as urinalysis for drugs), strip-searches are "likely to disclose much more than the limited information" specifically sought in the search.  *Id*.  Nevertheless, the court concluded that the teachers were entitled to qualified immunity because "at the time that the searches occurred, the law did not clearly establish the unlawfulness of the defendants' actions."  *Id*. at 603.

Although a student's legitimate privacy interests in his unclothed body is "great," the Sixth Circuit observes, a school system's need to "[maintain] an atmosphere free of theft" is also entitled to "some weight."  *Id*. at 605.  "But," the Sixth Circuit cautions, "a search undertaken to find money serves a less weighty governmental interest than a search undertaken for items that pose a threat to the health or safety of students, such as drugs or weapons."  *Id*. at 605 (citing *Oliver v. McClung*, 919 F. Supp. 1206, 1218 (N.D. Ind. 1995)).

In this case, as in *Beard*, the alleged strip-search violated the Fourth Amendment. Accepting J.T.'s factual allegations as true, the search offended J.T.'s legitimate expectation of privacy.  Specifically, it offended his objectively reasonable expectation that he would not be forced to strip to his undergarments by an adult woman such as Ms. Garno.  (That J.T. was not forced to completely disrobe, but merely strip to his undergarments, marginally mitigates the intrusiveness of the alleged search, but does not render it reasonable.)  The school's interest in confiscating a laser pointer and recovering stolen property, although legitimate, is not sufficiently weighty to justify an adult woman forcing a young man to strip.  *See Beard*, 402 F.3d at 605.  Plaintiffs have sufficiently alleged a violation of a constitutional right.

Plaintiffs have also demonstrated that the right was clearly established. "In order for the law to be clearly established as of the date of the incident," the Sixth Circuit cautions, "the law must truly compel (not just suggest or allow or raise a question about), the conclusion that what defendant is doing violates federal law in the circumstances." *Beard*, 402 F.3d at 605 (internal alterations and quotation marks omitted) (quoting *Saylor v. Bd. of Educ.*, 118 F.3d 507, 515–16 (6th Cir. 1997)). The court stated:

> In the 'rare instance' where it is proper to seek guidance from outside this circuit, the law will only be clearly established where the cases from outside this circuit both point unmistakably to the unconstitutionality of the conduct complained of and are so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Beard*, 402 F.3d at 608 (internal alterations and quotation marks omitted) (quoting *Williams v. Ellington*, 936 F.2d 881, 885 (6th Cir. 1991)).

Nevertheless, "unlawfulness can be apparent even in novel factual circumstances so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Beard*, 402 F.3d at 605 (quotation marks omitted) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). Crucially, even cases "cast at a high level of generality" are "sufficient to clearly establish the unlawfulness of the defendants' actions where the conduct at issue is 'obviously' a violation based on the prior cases." *Id.*

This is such an obvious case. Indeed, nearly two decades ago what "should be immediately apparent" to all was spelled out by the Seventh Circuit — "A nude search of a student by an administrator or teacher of the opposite sex would obviously violate [the Fourth Amendment]." *Cornfield v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993) (dictum).

Likewise, nearly three decades ago the Sixth Circuit quoted the Seventh Circuit for the proposition that "it does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude.  More than that: it is a violation of any known principle of human decency."  *Tartar v. Rayback*, 742 F.2d 977, 983 (6th Cir. 1984) (internal alterations omitted) (quoting *Doe v. Renfrow*, 631 F.2d 91, 92–93 (7th Cir. 1980) ("Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under 'settled indisputable principles of law.'").

Although this case does not involve a nude search, but rather an alleged order by a female administrator to a middle school male student to strip to his underwear, if true the alleged conduct "would obviously violate [the Fourth Amendment]."  *Cornfield*, 991 F.2d at 1320.

Reinforcing the conclusion is the counterfactual — a male principal directing a middle school girl to strip.  Traditionally, such a situation would not only subject the male principal to civil liability, but, perhaps, the risk of criminal prosecution as well.  *Cf.* Kay L. Levine, *No Penis, No Problem*, 33 Fordham Urb. L.J. 357, 362–88 (2006) (discussing the traditional concern with "men using their power and authority over children, usually girl children" and challenging "male perpetrator/female victim model"); Joe Stennis, Jr., *Equal Protection Dillemma: Why Male Adolescent Students Need Federal Protection from Adult Female Teachers Who Prey on Them*, 35 J.L. & Educ. 395, 400–03 (2006) (same).

In sum, based on the line of decisions discussed above, no reasonable school administrator would believe that it was acceptable for an adult woman to direct a middle school male student to strip to his underwear.  That is, based on clearly established legal principles discussed above, there would be no doubt in the mind of a reasonable officer that this conduct, if

challenged on constitutional grounds, would be found wanting. *Durham v. Nu'Man*, 97 F.3d 862, 866 (6th Cir. 1996) (citation and quotation omitted).

Finally, because of the deposition testimony of J.T., Plaintiffs have "offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Beard*, 402 F.3d at 603. Plaintiffs have carried their burden of demonstrating that Ms. Garno is not entitled to summary judgment based on the defense of qualified immunity.

Against this conclusion, Defendants make three principal arguments. None have merit. First, "Defendants deny that the Plaintiff was 'strip-searched' or that there was any other improper search." Defs.' Mot. Summ. J. 1. Notwithstanding this categorical denial of the factual predicate for Plaintiffs' claims, the deposition testimony of J.T. establishes a dispute regarding whether he was strip-searched by Ms. Garno on January 26, 2010, or October 13, 2010 (or, indeed, on both occasions). The Court is not authorized to make credibility determinations on summary judgment — those questions are reserved for a jury.

Next, arguing in the alternative, Defendants assert: "Assuming arguendo that a strip-search did occur, the legal authority to be quoted/referenced in other portions of this brief would require a finding that the search was justified at its inception and reasonable." Defs.' Mot. 11. A review of the authorities that Defendants collect, however, demonstrate not that the alleged strip-search was reasonable — but unreasonable. For example, Defendants write that *Beard v. Whitmore Lake School District* is "very closely on point." Defs.' Mot. 14. In *Beard*, as noted, the court held that strip-searches conducted by teachers of the same sex as the searched students "were not reasonable. Accordingly, under *T.L.O.* and *Vernonia*, the searches violated the Fourth Amendment." 402 F.3d at 605. Thus, contrary to Defendants' contention, if either of the alleged

-23-

strip-searches did in fact occur in this case, as in *Beard* the searches would have violated the Fourth Amendment.

Finally, and once more in the alternative, Defendants assert that "even assuming that the search of J.T.'s person was, arguably, constitutionally impermissible, [Ms. Garno] is, nevertheless, protected from civil liability . . . . It must be concluded that [Ms.Garno's] search of [J.T.] did not violate clearly established law." Defs.' Mot. 11, 12. Contrary to Defendants' contention, a uniform line of authority gave reasonable warning that strip-searching of a middle school student by a school administrator of the opposite sex would violate the Fourth Amendment.

In sum, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008) (citation and quotation omitted). A female school administrator who forces a male middle school student to disrobe to his underwear to search for a stolen music player or laser pointer is not entitled to qualified immunity.

**2**

Section 1983 does not impose vicarious liability. A local school district "cannot be held liable *solely* because it employs a tortfeasor — or, in other words, a [local school district] cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997). Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the [local school district] as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

In this case, Plaintiffs assert that the search policy implemented by Merrill Schools authorized the unlawful search.  Pls.' Resp. to Defs.' Mot. Summ. J. 17–18, ECF No. 38. Plaintiffs argue that "the policy, on its face, does not limit the ability of school officials to strip search students in the context of the extra-curricular activities. In fact, the language would permit a school official to engage in the  unconstitutional conduct which took place in the present case." *Id*. at 18.

 "Under no circumstances," the Merrill Schools search policy provides, "will school staff conduct or be party to a strip-search."   Merrill Schools Search Policy ¶ (A)(1)(a).   This categorical prohibition comes in the first paragraph of the policy.

It also provides that the search must be conducted in the presence of two authorized persons, providing: "A school official or his/her designee and one additional person may conduct a search. . . . A school official is defined as a Board Member, a superintendent, an assistant superintendent, a principal, an assistant principal, or lead teacher."  *Id*.

The following paragraphs go on to establish a number of procedures to be followed depending on: (1) whether the student consents to the search or not; (2) whether the student in grade school, middle school, or high school; (3) whether the school official has reasonable suspicion that the student poses a danger to others; and (4) whether the student's parents must be contacted.  For example, paragraph three of the policy provides:

> No school official may conduct a search unless he/she suspects, from reliable information of personal observation, that a student is in violation of school rules, local ordinance or state law.
>
> In such cases, the following procedure will be used:
>
> a)  The student will be informed of the reason for conducting the search.
>
> b)  Permission of the student to conduct the search will be requested.

1)  Conducting the search with the student's consent.

    The school official or his/her designee who is conducting this search has the right to request a student to empty pockets, purses, backpacks,  or other articles used to carry personal effects; to remove hats, shoes, and/or to roll socks down.  The school official can also request a student remove outer garments, such as sweatshirts, sweaters, jackets or vests if worn over blouses, shirts or t-shirts.  No school official or school employee has the right to request the removal of any other clothing or to conduct a strip search.

    If the student cooperates, the school official or his/her designee may notifiy the student's parent or guardian of the reason for such search.

2)  Procedure if the student refuses to cooperate.

    If a student refuses to cooperate, the school official or his/her designee has the authority to proceed, subject to the limitations described below.

a)  Pre K-8 students

    An attempt will be made to contact the student's parent or guardian in order to request him/her to encourage the student to cooperate.  If the parent or guardian cannot be reached or if the student continues to refuse to cooperate, the school official or his/her designee may turn the matter over to law enforcement officials for appropriate action.

*Id.* ¶ (A)(3).

    Plaintiff is correct that the policy also provides: "On a field trip, during an extra-curricular activity, or on a school bus, any school official or his/her designee, male or female, may conduct a search without the guidelines of the procedures covered under this policy."  *Id.* ¶ (A)(1)(a)(3).  Contrary to Plaintiffs' interpretation, however, this provision cannot reasonably be read to mean that Merrill Schools is authorizing strip-searching of students, provided that the strip searches occur "[o]n a field trip, during an extra-curricular activity, or on a school bus."

    When interpreting a document (whether a statute, a contract, or, as here, a school policy), the meaning "must, in the first instance, be sought in the language [itself]."  *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (interpreting statute); *see also Wonderland Shopping Ctr.*

*Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001) (interpreting contract). "The court examines the [document] as a whole, giving effect to all parts and language . . . according to their ordinary and natural meaning." *Wonderland*, 274 F.3d at 1092 (internal quotation marks omitted) (citing *City of Wyandotte v. Consolidated Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001)).

Here, the policy provides that the "procedures" ordinarily required at school — such as having two authorized school officials present before conducting a search and contacting the student's parent and law enforcement if the student declines to cooperate — are not required "[o]n a field trip, during an extra-curricular activity, or on a school bus."

Read in context, this provision is but a practical recognition of the limitations that staff face outside of school. On a field trip or school bus or at an extra-curricular activity, there may not be two authorized school officials present. There may not be a telephone readily available. Under these circumstances, the policy provides, "any school official . . . may conduct a search without the guidelines of the procedures covered under this policy." Merrill Schools Search Policy ¶ (A)(1)(a)(3). Crucially, however, the policy also provides, "Under no circumstances will school staff conduct or be party to a strip-search." *Id*. ¶ (A)(1)(a). The plain meaning of this unequivocal "no" is simply that — a categorical prohibition on strip-searches, whether at school, on a field trip, on a school bus, or at an extra-curricular event.

Moreover, even if Plaintiffs' proffered interpretation is linguistically possible, such a construction would lead to such absurd results that it could only be the product of an inartful draftsmanship. Plaintiffs suggest that the policy strictly circumscribes the scope of permissible searches at school (including an absolute prohibition on strip-searches), while giving school officials unfettered discretion outside of school (including absolute authority to strip-search

students).  No explanation for such a divergent policy suggests itself.[2]  Even if linguistically possible, such an interpretation illustrates the adage "There is no surer way to misread any document than to read it literally."  *Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, J., concurring).  Plaintiffs' proposed construction of the policy would lead to absurd results that reasonable parties could not have intended.  Accordingly, the Court declines to give the policy such an interpretation.

As Plaintiffs have not demonstrated a policy authorizing the alleged unlawful searches, Merrill Schools is entitled to summary judgment on Plaintiffs' § 1983 claim.

## B

Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, prohibits race discrimination in "any program or activity receiving Federal financial assistance."  It provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  § 2000d.

Title VI, unlike Title VII, "prohibits only intentional discrimination."  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (citing *Alexander v. Choate*, 469 U.S. 287, 293 (1985)).  The elements of a prima facie case of intentional discrimination, however, "are the same under both Title VI and VII."  *Brewer v. Bd. of Trustees of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007) (citing *Paul v. Theda Medical Ctr., Inc.*, 465 F.3d 790, 794 (7th Cir. 2006); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998)).  Specifically, "Adjusting terms for the educational context, that means membership in a protected class, meeting the school's legitimate educational expectations, an adverse educational action and worse treatment than that of similarly situated

---

[2] As an aside, neither Ms. Garno nor the school superintendent interpret the policy in this manner.  Garno Dep. 7:17–19; Kettlehohn Dep. 12:19–14:5, Feb. 16, 2012, *attached as* Pls.' Resp. Def.'s Mot. Ex. 4.

students not in the protected class." *Brewer*, 479 F.3d at 921 (citing *Byrant v. Indep. Sch. Dist. No. I-38 of Garvin Cnty., Okla.*, 334 F.3d 928, 930 (10th Cir. 2003)).

Here, setting to one side the question of whether Plaintiffs can establish the second element, the undisputed evidence demonstrates that they cannot establish the final element — "worse treatment than that of similarly situated students not in the protected class." *Id*.

Against this conclusion, Plaintiffs assert that they have stated a Title VI claim because they "established that J.T. was treated differently than the Caucasian boys involved in the locker room incident." Pls.' Supp. Br. 9. Specifically, "after a brief discussion on the practice field, the Caucasian boys, M.F. and N.R. were released back to practice, and J.T. was taken to the teachers' lounge." *Id*.

Accepting Plaintiffs' version of the events as true, Plaintiffs have nevertheless not established J.T. experienced worse treatment than similarly situated students.   *See* J.T. Dep.45:11–48:18. On the football field, J.T. testified in his deposition, he acknowledged that he was in possession of the misappropriated property. He recounted: "She pulled us aside and she said there's something that went wrong in the locker room. Were you guys in the locker room?" J.T. Dep. 46:19–21. When the young men did not respond, "she said did you guys take anything and then she was done and I said yeah, I have an MP3 player but I didn't take it. She's like okay, thank you. Can I have it? I gave it to her." J.T. Dep. 47:6–9. In J.T.'s deposition, counsel inquired:

> Q: So you said that you had the MP3 player?
> A: Yes.
> Q: But that you didn't take it?
> A: Yes.
> Q: Did you say anything else?
> A: No.
> Q: And you gave it to her?
> A: Yes.

> Q:  All right.  And at that point in time, had [M.F.] said anything to Ms. Garno?
> A:  No.
> Q:  Did he deny that he was in the locker room?
> A:  He didn't say anything.
> Q:  Never spoke a word?
> A:  No.
> Q:  And how about [N.R.]?
> A:  [N.R.], he said he wasn't in there.
> Q:  All right.  Did [N.R.] say anything else at that point in time?
> A:  No.
> Q:  Did you say anything else when you gave her the MP3 player?
> A:  No.
> Q:  Did she say anything else, that is, Ms. Garno?
> A:  Yeah.  She said thank you come with me and I went with her.
> Q:  All right.  Did she speak any other word to [N.R.] or [M.F.]?
> A:  She said you guys can go back to your football practice.
> Q:  And asked you to come with her?
> A:  Yes.

J.T. Dep. 47:10–18.  Thus, on the football field J.T. produced the stolen property.  M.F. and N.R.

did not.  Because J.T. was found in possession of this property, he was ordered back to school.

As M.F. and N.R. were not found to be in possession of stolen property, they were not ordered

back to school.

Thus, although J.T. was treated differently than M.F. and N.R., no evidence suggests that

Ms. Garno treated J.T. differently because of his race.  Rather, J.T. was treated differently

because unlike M.F. and N.R., J.T. was found to possess stolen property.

Lastly, as an aside the Court notes that even if J.T. has alleged sufficient facts to survive

the "light review" of the prima facie stage, he has alleged no facts suggesting that Defendants'

legitimate, non-discriminatory reason for calling J.T. back to the office was mere pretext for

intentional discrimination.  *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813–14 (6th

Cir. 2011) (instructing that although a general comparison of the allegedly similarly situated

individuals is necessary at the prima facie stage; however, this light review must be distinguished

from the more rigorous comparison conducted at the later stages of the *McDonnell Douglas*

analysis."). Nowhere in his deposition, for example, does J.T. allege that Ms. Garno harbors discriminatory animus.

As Plaintiffs' Title VI claim would not withstand a motion for summary judgment, leave to amend the complaint to add this claim will be denied.

### III

Accordingly, it is **ORDERED** that Plaintiffs' motion for leave to amend (ECF No. 14) is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' are granted leave to file an amended complaint asserting a § 1983 claim against Defendant Garno, but not against Defendant Merrill Schools. Plaintiffs are denied leave to file an amended complaint asserting a Title VI claim.

It is further **ORDERED** that Defendants' motion for summary judgment (ECF No. 35) is **GRANTED IN PART AND DENIED IN PART**. Defendant Garno's motion for summary judgment on Plaintiffs' § 1983 claim is denied. Defendant Merrill Schools' motion for summary judgment on Plaintiffs' § 1983 claim is granted.

Dated: July 12, 2012

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 12, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS